**STATE of Alaska, DEPARTMENT OF REVENUE, Appellant, Cross-Appellee,**

**v.**

**ALASKA PULP AMERICA, INC., Alaska Lumber & Pulp Co., Inc., Sitka Housing Development Co., Inc., Harbor Seafood, Inc., Wrangell Domestic International Sales Corporation, and Sitka Domestic International Sales Corporation, Appellees, Cross-Appellants.**

**Nos. 6583, 6594.**

Supreme Court of Alaska.

Sept. 30, 1983.

Barbara Herman, Asst. Atty. Gen., Wilson L. Condon, Atty. Gen., Juneau, for appellant, cross-appellee.

Michael T. Thomas, Robertson, Mongale, Eastaugh & Bradley, Anchorage, for appellees, cross-appellants.

Before BURKE, C.J., RABINOWITZ, and MATTHEWS, JJ., and CRANSTON, Judge.*

## OPINION

RABINOWITZ, Justice.

Alaska Lumber and Pulp Co., Inc. ["ALP"] and six subsidiary corporations [1] were wholly owned by Alaska Pulp Co., Ltd., a Japanese corporation. ALP was incorporated in Alaska in 1953. The Department of Revenue ["Department"] claims that these seven Alaska corporations ["the taxpayers"] are liable for the Alaska Business License Act taxes that were assessed by the Department auditor in 1978 for tax years 1971 through 1974.

A formal hearing was held in 1979. The Department hearing officer affirmed the findings of the Audit Division. On appeal, the superior court affirmed the Depart-

* Cranston, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16, of the Constitution of Alaska.

1. The wholly owned subsidiaries of ALP were: Alaska Pulp America, Inc. (formerly Wrangell Lumber Co.), Alaska Wood Products, Sitka Housing Development Co., Inc., Harbor Seafood, Inc., Wrangell Domestic International Sales Corporation, and Sitka Domestic International Sales Corporation.

ment's decision in all respects except as to the applicability of AS 43.05.260(a). Contrary to the Department, the court held that this statute bars all assessments for tax years 1971 through 1974. On reconsideration, the superior court decided that the notice of proposed assessment for 1974 gross receipts, which was sent by the Audit Division in 1978 to three of the corporations, tolled the statute. It therefore concluded that those assessments were not barred.

The Department appeals the superior court's decision, contending that the court erred in holding that AS 43.05.260(a) bars any of the assessments it made. The taxpayers cross-appeal, contending the court erred in holding they are liable for all of the taxes that the court held were not barred by the statute. For the reasons set forth below, we agree with the Department and disagree with the taxpayers. Accordingly, we conclude that the Department's assessments were correct in all respects.

I. *Applicability of AS 43.05.260(a)*

AS 43.05.260(a) was enacted on May 27, 1976, and made retroactive to January 1, 1976.[2] It reads:

> *Limitation on Assessment.* (a) Except as provided in AS 43.20.200(b), the amount of a tax imposed by this title must be assessed within three years after the return was filed, whether or not a return was filed on or after the date prescribed by law. If the tax is not assessed before the expiration of the three-year period, no proceedings may be instituted in court for the collection of the tax.

The taxpayers argue that AS 43.05.260(a) bars the assessment of taxes on returns filed prior to January 1, 1976, unless the assessment was made within three years of the filing. In essence, the taxpayers argue that AS 43.05.260(a) applies retroactively.

■ Absent clear language indicating legislative intent to the contrary, a law is presumed to operate prospectively only. AS 01.10.090; *Stephens v. Rogers Construction Co.,* 411 P.2d 205, 208 (Alaska 1966); *Hill v. Moe,* 367 P.2d 739, 742 (Alaska 1961), *cert. denied,* 370 U.S. 916, 82 S.Ct. 1554, 8 L.Ed.2d 498 (1962). Additionally, AS 01.10.100(a), Alaska's general saving statute, provides:

> *Effect of repeals or amendments.* (a) The repeal or amendment of any law does not release or extinguish any penalty, forfeiture, or liability incurred or right accruing or accrued under such law, unless the repealing or amending act so provides expressly. The law shall be treated as remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of the right, penalty, forfeiture, or liability.

■ Nothing in the language of AS 43.05.260(a) indicates a legislative intent that it should apply to returns filed prior to its effective date. On the contrary, the legislature specifically provided that the act would operate retroactively to January 1, 1976. This indicates that the amendment does not bar assessments on returns filed prior to January 1, 1976.

■ The taxpayers argue that AS 01.10.100(a) only prohibits the retroactive application of a statute affecting "vested" rights, *see Bidwell v. Scheele,* 355 P.2d 584, 586–87 (Alaska 1960), and that the state's right to bring an action for taxes does not vest until the assessment has been completed. This analysis, however, focuses on the wrong party. The taxpayer's obligation to pay taxes accrues in the year the income is received. In accordance with AS 01.10.100(a), a period of limitations provided by a later tax act cannot release a taxpayer from that liability.[3]

2. *See* Ch. 94, § 5, SLA 1976.

3. *See Alaska v. American Can Co.,* 358 U.S. 224, 226, 79 S.Ct. 274, 275, 3 L.Ed.2d 257, 259 (1959); *Alascom, Inc. v. North Slope Borough,* 659 P.2d 1175, 1180 (Alaska 1983); *Hickel v. Stevenson,* 416 P.2d 236, 238–39 (Alaska 1966); *Wooten v. Oklahoma Tax Comm'n,* 170 Okl. 584, 40 P.2d 672, 674–75 (1935).

*State v. Alden Mills,* 202 La. 416, 12 So.2d 204 (1943), on which the taxpayers rely, does not support their argument. In that case, the

■ The taxpayers argue alternatively that barring state action not taken within three years on any return filed before the effective date of AS 43.05.260(a) does not constitute a retrospective application of the statute. They evoke an accepted tenet of statutory construction that a statute is not made retroactive merely because it draws upon antecedent facts for its operation. 2 C. Sands, Sutherland Statutory Construction § 41.02 (4th ed. 1973). In citing this canon and the cases that have employed it, however, the taxpayers have overlooked the significance of the word "merely." In each of the cited cases the court made specific findings that operation of the statute did not destroy vested rights or impair prior obligations.[4]

*Sturges v. Carter,* 114 U.S. 511, 5 S.Ct. 1014, 29 L.Ed. 240 (1885), relied on by taxpayers, is distinguishable. There the Supreme Court rejected the proposition that "the taxpayer has a vested right in the fruits of his false returns," *id.* at 519, 5 S.Ct. at 1017, 29 L.Ed. at 243. It concluded that an amendment to an Ohio statute authorizing the county auditor to reassess the taxes on returns filed up to four years before a return determined to be fraudulent was filed did not violate a state constitutional prohibition against retroactive laws. Application of AS 43.05.260(a) to returns filed prior to January 1, 1976, would release the taxpayers from tax liabilities they incurred when they received income. This result is prohibited by Alaska's saving statute.

As the taxpayers note, we have previously held that "mere procedural changes which do not affect substantive rights are not immune from retrospective application." *Matanuska Maid Inc. v. State,* 620 P.2d 182, 187 (Alaska 1980). Of particular significance here is the word "mere." Although statutes of limitation are generally considered procedural, the taxpayers' argument fails for the reasons articulated by the Supreme Court of California, and previously cited by this court:

> [T]he presumption against retrospective construction does not apply to statutes relating merely to remedies and modes of procedure .... In other words, procedural statutes may become operative only when and if the procedure or remedy is invoked, and if the trial postdates the enactment, the statute operates in the future regardless of the time of occurrence of the events giving rise to the cause of action. *Blyer v. Hershman,* 156 Misc. 349, 281 N.Y.S. 942, 944. In such cases the statutory changes are said to apply not because they constitute an exception to the general rule of statutory construction, but because they are not in fact retrospective. There is then no problem as to whether the Legislature intended the changes to operate retroactively.
>
> This reasoning, however, assumes a clear-cut distinction between purely "procedural" and purely "substantive" legislation. In truth the distinction relates not so much to the form of the statute as to its effects. *If substantial changes are made, even in a statute which might ordinarily be classified as procedural, the operation on existing rights would be retroactive because the legal effects of past events would be changed,* and the statute will be construed to operate only in futuro unless the legislative intent to the contrary clearly appears.

*Aetna Casualty & Surety Co. v. Industrial Accident Commission,* 30 Cal.2d 388, 182 P.2d 159, 161–62 (1947) (emphasis added), *cited in Matanuska Maid, Inc. v. State,* 620 P.2d at 187.

Louisiana legislature had passed a constitutional amendment limiting the state to three years for the collection of past due taxes. The court held that the legislature intended to bar the collection of taxes that had accrued prior to the effective date of the amendment. The court specifically noted, however, that if the legislature had merely enacted a statute, instead of a constitutional amendment, it would only have had prospective application.

4. *Cox v. Hart,* 260 U.S. 427, 435, 43 S.Ct. 154, 157, 67 L.Ed. 332, 337 (1922); *Frisbie v. Sunshine Mining Co.,* 93 Idaho 169, 457 P.2d 408, 411 (Idaho 1969); *Creighan v. City of Pittsburgh,* 389 Pa. 569, 132 A.2d 867, 870 (Pa. 1957).

The legal effect of past events would indeed be changed if AS 43.05.260(a) were applied to bar assessment of the taxpayers' 1971–74 tax liability. Thus, we cannot conclude that the three-year statute of limitation in this case is merely procedural.

Two other considerations militate against the statutory construction urged by the taxpayers. First, statutes of limitation barring the assessment and collection of taxes are strictly construed in favor of the government.[5] Second, although the applicability of AS 43.05.260(a) turns on statutory interpretation, and we therefore consider the statute independently of the Department's interpretation, the Department's interpretation is entitled to "some weight."[6] The statutory amendment under consideration was requested by the governor at the instigation of the Department. The bill was submitted with the Department's understanding that it would operate prospectively only and have no impact on public finances. We think the Department's interpretation is persuasive and hold that AS 43.05.260(a) does not bar assessment of the taxpayers' Business License Act taxes for 1971–74.[7]

## II. *Taxability of Certain Transactions*

The activities of the taxpayers involved here present a veritable maze of corporate enterprise. During the years in question, they collectively purchased and cut timber under contracts with the U.S. Forest Service and the State of Alaska, operated a pulp mill and two saw mills, acquired a seafood company, formed a housing development company, and incorporated two domestic international sales corporations (DISCs), which acted as sales agents for the other companies abroad.

Each corporation was a wholly owned subsidiary of another, and although reorganizations and name changes at times altered their relative positions on the corporate chart, parents and their offspring maintained close ties. The companies were commonly owned, centrally managed, and had interlocking officers and boards of directors.

The taxpayers argue in their cross-appeal that the Audit Division erroneously determined their intercompany transactions were taxable as gross receipts under the Alaska Business License Act ("ABLA").[8] They base their argument on interpretations of the statutory definitions of "business" and "person" set forth in AS 43.70.110.

AS 43.70.110(1) defines business for purposes of the ABLA as follows:

> "Business" includes *all* activities or acts, personal, professional, or corporate, *engaged in or caused to be engaged in,* or following or engaging in a trade, profession, or business, including receipts from advertising services, rental of personal or real property, construction, processing, or manufacturing, but excluding fisheries businesses, fishermen, liquor licenses, insurance businesses, mining, and coin-op-

5. *McDonald v. United States,* 315 F.2d 796, 801 (6th Cir.1963); *United States v. Heyl,* 232 F.Supp. 489, 491 (S.D.N.Y.1964); *United States v. City of New York,* 134 F.Supp. 374, 378 (S.D.N.Y.1955).

6. *Wien Air Alaska, Inc. v. Department of Revenue,* 647 P.2d 1087, 1090 (Alaska 1982); *National Bank of Alaska v. State,* 642 P.2d 811, 815–16 (Alaska 1982); *Union Oil Co. v. Department of Revenue,* 560 P.2d 21, 25 (Alaska 1977).

This same standard of review applies to each statutory construction argument raised by the taxpayers in their cross-appeal, which is discussed later in this opinion.

7. This holding makes it unnecessary to consider whether notice of proposed assessments tolled the three year limitation of AS 43.05.-260(a).

8. The ABLA imposes a tax on gross receipts, that is, on all money, credits or other consideration received, and does not permit any deductions for money paid to cover expenses. AS 43.70.030 (amended 1978). Former AS 43.70.-030 provided, in relevant part:

> (a) The license fee for each business is $25 plus a sum equal to one-half of one per cent of the gross receipts in excess of $20,000 from the business during the year for which the license is issued . . . .

The "percentage of gross receipts" tax of the ABLA was repealed in 1978. 1978 Alaska Sess.Laws chap. 144, § 3.

erated amusement and gaming machines, calling or vocation, *with the object of financial or pecuniary gain, profit or benefit, either direct or indirect,* and not exempting subactivities producing marketable commodities or services used or consumed in the main business activity, each of which subactivities shall be considered business....

(Emphasis added.)

The taxpayers argue that their activities constituted a single "business," and should therefore be taxed as one unit rather than separately. In our view, this argument ignores the clear language of the statute and leads to an untenable result that contravenes the legislative intent to tax all businesses proportionately. *Territory of Alaska v. Journal Printing Co.,* 135 F.Supp. 169, 171 (D.Alaska 1955). It is undeniable that each of the taxpayers was engaged in corporate activities, or was caused by a parent corporation to engage in such activities, with the object of financial gain, either for the direct benefit of the corporation or the indirect benefit of its parent corporation.

The taxpayers appear to be proposing that affiliated corporations are entitled to an exemption from separate ABLA taxation on their individually earned gross receipts or net income. AS 43.70.110(1) identifies only six exceptions in its definition of business, none of which includes the taxpayers' proposal. AS 43.70.010 [repealed by ch. 144, § 5, SLA 1978] identified ten other exemptions, but similarly did not exempt affiliated corporations. The maxim "expressio unius est exclusio alterius" precludes our inferring an exemption for affiliated corporations. *See* 2A C. Sands, Sutherland Statutory Construction § 47.23, at 123 (4th ed. 1973), *Territory of Alaska v. Journal Printing Co.,* 135 F.Supp. at 171.

We are similarly unpersuaded by the taxpayers' reading of the definition of "person." AS 43.70.110(4) defines a person, for purposes of the ABLA, as follows: "'Person' includes an individual, firm, partnership, joint adventure, association, corporation, estate trust, business trust, receiver, or any group or combination acting as a unit." The phrase "or any group or combination acting as a unit" indicates that the legislature intended to subject even informal business arrangements to the ABLA. It does not mean, contrary to the taxpayers' argument, that related corporate entities are relieved of their tax obligations.

In support of their position, the taxpayers cite two cases that purportedly indicate that commonly owned and managed corporations should be treated as one "person" under the ABLA: *Honolulu Oil Corporation v. Franchise Tax Board,* 60 Cal.2d 417, 34 Cal.Rptr. 552, 386 P.2d 40 (1963); *Butler Brothers v. McColgan,* 17 Cal.2d 664, 111 P.2d 334 (1941), *aff'd,* 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942). Both of these cases, however, were concerned with whether the instate business of a multistate corporation was sufficiently distinct from its business outside the state to justify using an allocation formula to compute its state franchise tax. Here, we are dealing with Alaska corporations doing business exclusively in Alaska.

Generally, courts refuse to look through the corporate veil and consider separate corporations a single unit even when inter-corporation transactions are mere bookkeeping entries. *Westland Corp. v. Commissioner of Revenue,* 83 N.M. 29, 487 P.2d 1099, 1102–03 (N.M.App.1971); *Northwestern Pacific Railroad Co. v. State Board of Equalization,* 21 Cal.2d 524, 133 P.2d 400, 403–04 (Cal.1943); *Rexall Drug Co. v. Peterson,* 113 Cal.App.2d 528, 248 P.2d 433, 434 (1952). Similarly, we reject the statutory interpretation proposed by the taxpayers and hold that these corporations, even if commonly owned and managed, are separately taxable under the ABLA.

### III. *Manufactured or Processed Products*

Alaska Wood Products (AWP) and Wrangell Lumber Company (WLC), subsidiaries of ALP, operated sawmills which produce lumber and cants from saw logs purchased from ALP. ALP cut the logs under contracts with the State of Alaska and the United States Forest Service, trimmed

branches, squared broken ends, sorted the logs and bundled them for transportation to the sawmills. ALP argues that even if we conclude that the taxpayers' inter-corporation transactions constitute gross receipts, the cost of saw logs cut under ALP's timber sale contracts were exempt from the ABLA under AS 43.70.010(a)(7) [repealed by ch. 144, § 5, SLA 1978]. AS 43.70.010(a)(7) exempted "gross receipts of a manufacturer or processor derived from the sale of his product manufactured or processed in the state, except where the products are sold directly to the consumer." ALP argues that the term "manufactured or processed" is broad enough to include the cutting, trimming, and sorting of logs. We disagree.

We note, first, that tax exemptions are construed narrowly against the taxpayer. *Greater Anchorage Area Borough v. Sisters of Charity of the House of Providence,* 553 P.2d 467, 469 (Alaska 1976). Second, the perimeters of our interpretation of "manufactured or processed" are limited by the legitimate legislative intent to encourage the development of a stable economic base in Alaska not dependent upon seasonal, resource-based employment. *See, e.g., K & L Distributors, Inc. v. Murkowski,* 486 P.2d 351, 359 (Alaska 1971). Interpreting AS 43.70.010(a)(7) as including the harvesting of timber would not fulfill the legislature's purpose.

Opinions of other courts cited by both the Department and the taxpayers illuminate the applicability of the terms "manufactured or processing" to sawmills which manufacture saleable timber products from logs.[9] This, however, is not the issue at bar. Both AWP and WLC were granted the exemption. We think a concurring opinion in the *Benedict* case, relied on by the taxpayers, instructive. It cautions that the term "manufactured" should not be construed so broadly as to include logging activities that occur before the logs reach the mill-operating manufacturer.

> I think under no proper rule of construction can a saw log be brought within these definitions. If it is an article manufactured from the produce of the state, then the owner of the trees, who felled it and divided it into cuts of suitable lengths for the use of the sawyer, is a "manufacturer," and yet who would so pervert the meaning of that term? Or who would say that the log as it lay upon the ground was a manufactured article? In what respect has it "acquired changed condition, or new and specific combinations"? Its form has not been altered from what it was when it was a part of the tree. It has been simply dissevered from the trunk or stock of the tree, and is now prostrate, when, before the ax of the laborer was applied, forming a part of the stock or trunk, it stood upright.

*Benedict v. Davidson County,* 67 S.W. at 809 (Beard, J., concurring).

We believe that the cutting of timber preparatory to transporting it to a sawmill, like the catching and sorting of fish, *Huron Fish Co. v. Glander,* 146 Ohio St. 631, 67 N.E.2d 546, 548 (Ohio 1946), does not transform raw material into a "product of substantially different character," and does not come within the definition of "manufacturing" accepted by the majority of American courts.[10]

15 AAC 05.130, promulgated prior to 1959, provides as follows: "Gross receipts

9. *State v. Grayson Lumber Co.,* 271 Ala. 35, 122 So.2d 126 (Ala.1960); *Stearns Coal & Lumber Co. v. Thomas,* 295 Ky. 808, 175 S.W.2d 505 (Ky.App.1943), *Benedict v. Davidson County,* 110 Tenn. 183, 67 S.W. 806 (Tenn.1902).

10. *Solite Corp. v. County of King George,* 220 Va. 661, 261 S.E.2d 535, 536 (1980) (extraction and processing of sand and gravel are not "manufacturing").

Kentucky seems to stand alone in defining "manufacturing" as giving "[m]aterial having no commercial value for its intended use before processing ... appreciable commercial value for its intended use after processing ...." *Department of Revenue v. Allied Drum Service, Inc.,* 561 S.W.2d 323, 325–26 (Ky.1978). Even if ALP had argued that its operations increased the value of the logs, we decline to follow Kentucky in ascribing a meaning to "manufacturing or processing" that goes beyond common usage of the terms. *See Lynch v. McCann,* 478 P.2d 835, 837 (Alaska 1970).

obtained from the sale of logs to manufacturers or others are includable receipts subject to the license levy." When an agency interpretation of a statute is long-standing, as it is here, it is entitled to some deference by this court. *State v. Debenham Electric Supply Co.,* 612 P.2d 1001, 1003 n. 6 (Alaska 1980). We hold that ALP's logging activities did not constitute the activities of a "manufacturer or processor" within the ABLA taxation exemption provided in AS 43.70.010(a)(7).

IV. *The DISC Commissions And Dividends*

In 1971, Congress amended the Internal Revenue Code to authorize the formation of DISCs, which provide federal income tax incentives for domestic corporations selling American products abroad. 26 U.S.C. §§ 991–997. The DISC is a legal fiction that acts, theoretically, as a sales agent for the products of its parent corporation. The DISC earns a commission on the sales from the parent corporation, amounting to 50% of the net income or 4% of the export gross profits, whichever is greater. The DISC then returns the amount of the commission to the parent in the form of a nontaxable producer's loan. At the end of the tax-year, the DISC distributes a dividend to the parent in the amount of one-half of its taxable income. No assets ever change hands between the DISC and its parent; the transactions are mere bookkeeping entries. The DISC pays no federal tax on its commission, and the parent pays federal tax only on its deemed dividend, or one-half the tax it would have had to pay without the DISC.

In 1974, the Wrangell Domestic International Sales Corporation (WDISC) and Sitka Domestic International Sales Corporation (SDISC) were formed to take advantage of the considerable federal tax advantages provided by the DISC provisions of the Internal Revenue Code. Between 1974 and 1976, the combined commissions earned by WDISC and SDISC totaled $25,629,210.

The Department assessed ABLA taxes against WDISC and SDISC for their commissions and dividends, as well as penalties for their failure to file returns. The taxpayers contend that DISCs are immune from ABLA taxes. They raise two arguments, each of which is discussed separately below.

A. *DISC Commissions and Dividends Are Gross Receipts for Purposes of the ABLA.*

The taxpayers first argue that the WDISC and SDISC dividends and commissions are not "gross receipts" as defined by AS 43.70.110(3), because they do not constitute "money, credits or other valuable consideration received from engaging in or conducting a business" as set forth in the statute. This argument, analogous to the taxpayers' argument that related corporations should be treated as one unit, requires construction of the terms "credits" and "business."

We think it is irrelevant that the DISC-related income comes in the form of commissions and dividends. *See International Harvester Co. v. Wisconsin Department of Taxation,* 322 U.S. 435, 441, 64 S.Ct. 1060, 1063, 88 L.Ed. 1373, 1379 (1944). AS 43.70.110(2) does not require an exchange of cash for "credits" to come under the broad definition of gross receipts. "Credits" encompass any incorporeal personalty used as a means of payment, and include commissions and dividends.

The taxpayers contend that the DISCs did not engage in activities that may be construed as "business" under AS 43.70.-110(1). The Department persuasively counters that WDISC and SDISC did engage in, or were caused to be engaged in, corporate activities with the object of financial benefit. Their activities, therefore, fall within the statutory definition of "business."

*Cook Export Corp. v. King,* 617 S.W.2d 879 (Tenn.1981) involved a DISC incorporated in Tennessee that claimed exemption from state corporate taxation on the basis that it did not "do business" in Tennessee or in any other state. As in the case before us, the DISC made sales abroad, maintained separate bank accounts and records, re-

ceived commissions, and declared dividends to its parent. The court held that the management of these corporate affairs constituted "doing business" within the purview of the Tennessee tax laws.

> It is untenable for the parent to contend that this subsidiary does not effectively exist for purposes of state taxation and yet insist that it does exist as a viable legal entity for purposes of federal taxation....
>
> The fact that parties may conduct business transactions in such a way as to take advantage of federal taxation does not necessarily entitle them to exemption from state taxation under other and different statutes.... Nor will parties which have deliberately adopted a corporate structure and form be permitted to disregard these when they become disadvantageous.

617 S.W.2d at 881 (citations omitted). Accord *Department of Revenue v. The Early & Daniel Co.,* 628 S.W.2d 630 (Ky.1982).

It is not without significance that AS 43.20.036(c) expressly permits taxpayers to apply their federal DISC exemption in calculating the income tax payable under AS 43.20.011–43.20.350. There is no similar provision carrying the exemption over to ABLA taxes. When the Alaska legislature has not acted to recognize a federal deduction or shelter, this court will not infer into the law a tax deferral scheme simply for the sake of consistency with the federal laws.[11] The ABLA contains no provision giving special tax treatment to DISCs, and we decline the invitation to create one.

B. *Constitutionality of the Gross Receipts Tax as Applied to DISC Dividends and Commissions.*

Despite the fact that the Department did not assess taxes on overseas sales, and that all of the taxes that were assessed were the product of economic activities conducted solely in Alaska by Alaska corporations, the taxpayers assert that state taxation of DISC commissions and dividends runs afoul of the commerce clause, art. I, § 8, and the import-export clause, art. I, § 10, of the United States Constitution.

*Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326, *reh'g denied,* 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977), laid to rest the view that interstate commerce is entitled to "free trade" immunity from state taxation. *Id.* at 278, 97 S.Ct. at 1078, 51 L.Ed.2d at 330. The Supreme Court recognized "that interstate commerce may be made to pay its way." *Id.* at 284, 97 S.Ct. at 1081, 51 L.Ed.2d at 334. *See Colonial Pipeline Co. v. Traigle,* 421 U.S. 100, 95 S.Ct. 1538, 44 L.Ed.2d 1 (1975). The Court identified a four part test for determining the constitutionality of a state tax under the commerce clause, 430 U.S. at 277–78, 97 S.Ct. at 1078, 51 L.Ed.2d at 330:

(1) *The activity taxed must have a sufficient nexus with the state to justify a tax.*

The taxpayers argue that the only activities conducted by WDISC and SDISC were overseas sales. This view, however, does not take into account the bookkeeping, banking, receiving commissions and declaring dividends, which we have already determined constitute corporate "business" within the state. "[There is] nothing unconstitutional about a tax which is contingent upon events brought to pass without a state, so long as there is a nexus between such tax and transactions within a state for which the tax is an exaction." *Sjong v. State,* 622 P.2d 967, 977 (Alaska 1981), *appeal dismissed,* 454 U.S. 1131, 102 S.Ct. 986, 71 L.Ed.2d 284 (1982), *citing Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 445, 61 S.Ct. 246, 250, 85 L.Ed. 267, 271 (1940).

The relevant transactions were all conducted intrastate. It is immaterial that the

11. We reject the taxpayers' suggestion that this court is required to interpret Alaska tax laws as incorporating all of the credits, rules, loopholes and incentives authorized under the federal tax scheme. *See Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 448, 100 S.Ct. 1223, 1237, 63 L.Ed.2d 510, 528 (1980).

benefits enjoyed by WDISC and SDISC and their parent corporations were the indirect consequence of overseas sales. *See Westinghouse Electric Corp. v. Tully,* 55 N.Y.2d 364, 449 N.Y.S.2d 677, 681, 434 N.E.2d 1044, 1048 (1982) *appeal filed,* 51 U.S.L.W. 3006 (July 13, 1982).

(2) *The tax must be fairly related to benefits provided by the state to the taxpayer.*

The taxpayers contend that the state provided no benefits that justify the levying of a tax on their activities. They concede, however, that the state provided a corporate name and charter, and that under *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 622, 101 S.Ct. 2946, 2955, 69 L.Ed.2d 884, 897 (1981), "there is no requirement . . . that the amount of general revenue taxes collected from a particular activity must be reasonably related to the value of the services provided to the activity."

We hold that subject taxes assessed against the taxpayers were fairly related to the benefits that the taxpayers received. *See Sjong v. State,* 622 P.2d at 971. Among those benefits are the legal status to sue and be sued in our state courts, continuity of business without interruption by death or dissolution, transfer of property interests by disposition of shares of stock, business control and management by corporate directors and the general absence of individual liability. These privileges were found sufficient in *Colonial Pipeline Co. v. Traigle,* 421 U.S. at 112, 95 S.Ct. at 1545, 44 L.Ed.2d at 11, to justify Louisiana's taxation of a foreign corporation carrying on interstate business in Louisiana. As Justice Frankfurter noted in an early Alaska case, "Constitutional issues affecting taxation do not turn on even approximate mathematical determinations." *Mullaney v. Anderson,* 13 Alaska 574, 579, 342 U.S. 415, 418, 72 S.Ct. 428, 430, 96 L.Ed. 458, 462 (1952).

(3) *The tax must not discriminate against interstate commerce,* and

(4) *The tax must be fairly apportioned to local activities.*

We shall deal in summary fashion with the taxpayers' contentions that the ABLA assessments do not meet the third and fourth prongs of the *Complete Auto Transit* test because DISC gross receipts are derived from foreign transactions. We note that the taxes on these corporations were assessed at the same rate as all other Alaska businesses, and that only the intrastate transactions between the DISCs and their parent corporations were taxed, not their foreign transactions.

ABLA taxation of DISCs, incorporated in and doing business in Alaska, meets the *Complete Auto Transit* test and therefore does not violate the commerce clause. This does not end our inquiry, however. When a tax is challenged under the import-export clause, the court must, in addition, determine whether the tax offends any of the three purposes of that clause, as delineated in *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976).

The three purposes of the import-export clause are (1) to commit sole power to regulate foreign commerce to the federal government, (2) to prevent diversion of import revenues from the federal government to the state, and (3) to prevent seaboard states from enjoying an unfair advantage over inland states. *Michelin Tire Corp. v. Wages,* 423 U.S. at 285–86, 96 S.Ct. at 540–41, 46 L.Ed.2d at 503.

This case does not involve imports, and the second of the policies is therefore not implicated. *Department of Revenue v. Association of Washington Stevedoring Cos.,* 435 U.S. 734, 758, 98 S.Ct. 1388, 1403, 55 L.Ed.2d 682, 702 (1978).

As for the first of the policies, we find it significant that Congress did not intend to pre-empt the states from taxing DISCs. *Westinghouse Electric Corp. v. Tully,* which held that state taxation of DISCs does not impose an unconstitutional burden on foreign commerce, noted the legislative history of the DISC legislation:

On September 8, 1971, shortly before the DISC legislation was enacted, John S. Nolan, Deputy Assistant Secretary of the Treasury for Tax Policy, spokesman for the sponsoring department, in the company of then Secretary of Treasury John B. Connally, officially appeared at a hearing before the Committee on Ways and Means of the House of Representatives. There, Mr. Nolan, in response to an expression of committee concern that the proposal might "prohibit States from Levying corporate income taxes on a DISC", was unequivocal in his declaration that the proposed bill would leave the States "free to impose the tax, if they choose to do so" (see Hearings before House Committee on Ways and Means on the Tax Proposals Contained in the President's New Economic Policy, 92d Cong., 1st Sess., Part I, pp. 170–171). Moreover, not without significance, proposed legislation which might have pre-empted the States from taxing DISC's was considered by the same committee in 1980, only to be permitted to die without any action (see H.Rep. No. 5076, 96th Cong., 2d Sess.; Hearing before Committee on Ways and Means on State Taxation of Foreign Source Income, pp. 29, 326). Overall, then, our State is far from constrained by a clear statement that Congress intended to exercise its commerce power in full (see Tribe, American Constitutional Law, §§ 5–8, p. 243).

*Westinghouse Electric Corp. v. Tully,* 449 N.Y.S.2d at 681, 434 N.E.2d at 1048. *See also Bunge Corporation v. Secretary of the Department of Revenue and Taxation,* 419 So.2d 1288, 1294 (La.App.1982).

The Department has not assessed a tax on goods moving in foreign trade, *see Canton R. Company v. Rogan,* 340 U.S. 511, 71 S.Ct. 447, 95 L.Ed. 488, 20 A.L.R.2d 145 (1951); *Western Maryland R. Company v. Rogan,* 340 U.S. 520, 71 S.Ct. 450, 95 L.Ed. 501 (1951), nor has it taxed "instrumentalities of foreign commerce." *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 450, 99 S.Ct. 1813, 1822, 60 L.Ed.2d 336, 349 (1979). In whatever light we examine the taxpayers' objections to the Department's taxation of DISCs, we fail to discern how that tax prevents "the Federal Government [from] speak[ing] with one voice when regulating commercial relations with foreign governments." *Michelin Tire Corp. v. Wages,* 423 U.S. at 285, 96 S.Ct. at 540, 46 L.Ed.2d at 503.

The third purpose of the import-export clause, preserving harmony among the states, is vindicated when the tax meets the *Complete Auto Transit* commerce clause test, discussed above. *Department of Revenue v. Association of Washington Stevedoring Cos.,* 435 U.S. at 754–55, 98 S.Ct. at 1401, 55 L.Ed.2d 700.

> A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society.

*Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444, 61 S.Ct. 246, 249, 85 L.Ed. 267, 270 (1940).

It becomes evident that Alaska is not taking unfair advantage of its geographic location by taxing WDISC and SDISC when it is observed that two of the cases we have relied on involving state taxation of DISCs arise from land-locked states. *See Department of Revenue v. The Early & Daniel Co.,* 628 S.W.2d 630 (Ky.1982); *Cook Export Corporation v. King,* 617 S.W.2d 879 (Tenn. 1981).

The Department's assessment of ABLA taxes on WDISC and SDISC gross receipts does not conflict with the commerce clause or the import-export clause of the United States Constitution. The assessment merely requires the taxpayers to pay their just share for the privilege of conducting business in Alaska.

In conclusion, we hold that (1) AS 43.05.-260(a) does not operate retroactively to absolve the taxpayers of their accrued tax liability for the years 1971–74, (2) each of the corporations comes within the statutory definitions of "persons" "engaged in busi-

ness" whose gross receipts are individually subject to ABLA assessments, (3) saw logs cut from standing timber and transported to saw mills are not exempt from ABLA taxation as "manufactured or processed products," and (4) neither the commerce clause nor the import-export clause of the United States Constitution prohibits the taxation of DISCs.

AFFIRMED in part, REVERSED in part.