## CANTON RAILROAD CO. *v.* ROGAN ET AL., CONSTITUTING THE STATE TAX COMMISSION OF MARYLAND.

No. 96. Argued November 28–29, 1950.—Decided February 26, 1951.

512

 

*John Henry Lewin* argued the cause and filed a brief for appellant.

*Hall Hammond,* Attorney General of Maryland, and *Harrison L. Winter,* Assistant Attorney General, argued the cause and filed a brief for appellees.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The State of Maryland imposes on steam railroad companies a franchise tax, measured by gross receipts, apportioned to the length of their lines within the State.[1] Appellant Canton Railroad Company, a Maryland corporation, challenges the validity of the tax under the Import-Export Clause of the Constitution, Art. I, § 10, cl. 2, insofar as the gross income by which the tax is measured includes revenues derived from the handling of goods moving in foreign trade.

Canton is a common carrier of freight operating entirely within the City of Baltimore, Maryland. It maintains a marine terminal in the port of Baltimore and railroad lines connecting this terminal with the lines of major trunk-line railroads. Its operating revenues are derived from services which fall into the following classifications:

Switching freight cars from the piers to the lines of connecting railroads.

Storage pending forwarding, for which a charge is made for each day beyond a free period.

Wharfage, or the privilege of using Canton's piers for the transfer of cargo to lighters or to trucks.

---

[1] Md. Ann. Code (1943 Supp.), Art. 81, §§ 94½ and 95.

Weighing of loaded freight cars.

Furnishing a crane for use in unloading vessels. This crane is operated by a stevedoring company, which pays Canton a set charge per ton for the "crane privilege."

A substantial proportion of the freight moved to and from the port consists of exports from and imports into the United States. In its report to the State Tax Commission for 1946, Canton showed gross receipts from its railroad business in Maryland of $1,588,744.48, of which it claimed $705,957.21 to be exempt from taxation because derived from operations in foreign commerce. After a hearing, the Commission rejected Canton's contention that a part of its gross receipts was constitutionally exempt from the tax, assessed its gross receipts at the higher figure, and imposed a tax of $39,092.34. The Commission's order was affirmed both by the Baltimore Circuit Court and by the Court of Appeals of Maryland, two judges dissenting. —— Md. ——, 73 A. 2d 12.

The case is here on appeal.

The Constitution commands in Art. I, § 10, cl. 2 that "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws . . . ." The Maryland court held that the tax does not violate this provision of the Constitution; and we agree.

If this were a tax on the articles of import and export, we would have the kind of problem presented in *Spalding & Bros.* v. *Edwards,* 262 U. S. 66; *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69; *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652; and *Joy Oil Co.* v. *State Tax Comm'n,* 337 U. S. 286. But the present tax is not on the articles of import and export; nor is it the equivalent of a direct tax on the articles, as was held to be true of stamp taxes on foreign bills of lading (*Fairbank* v. *United States,*

181 U. S. 283), stamp taxes on charter parties in foreign commerce (*United States* v. *Hvoslef,* 237 U. S. 1); and stamp taxes on policies insuring exports against maritime risks. *Thames & Mersey Ins. Co.* v. *United States,* 237 U. S. 19. It is true that the latter cases indicate that the prohibition of the Import-Export Clause against taxes on imports and exports involves more than an exemption from taxes laid upon the goods themselves. Moreover, *Crew Levick Co.* v. *Pennsylvania,* 245 U. S. 292, following the reasoning of *Brown* v. *Maryland,* 12 Wheat. 419, 444–445, gave like immunity to the business of selling goods in foreign commerce when gross receipts were taxed. Cf. *Anglo-Chilean Corp.* v. *Alabama,* 288 U. S. 218. Though appellant is not engaged in the import-export business, it claims that its handling of goods, which are destined for export or which arrive as imports, is part of the process of exportation and importation. In support of the argument it refers to language in *Spalding & Bros.* v. *Edwards, supra,* and *Richfield Oil Corp.* v. *State Board, supra,* relative to when the export process starts; and it argues that, if the baseballs and the baseball bats in *Spalding*[2] and the oil in *Richfield* were immune from the sales taxes because those commodities had been committed to exportation, the same immunity should be allowed here since the goods handled by appellant were similarly committed. The difference is that in the present case the tax is not on the *goods* but on the *handling* of them at the port. An article may be an export and immune from a tax long before or long after it reaches

[2] This case involved a federal tax equivalent to 3 per cent of the price "upon all tennis rackets, golf clubs, baseball bats," etc. Act of Oct. 3, 1917, § 600 (f), 40 Stat. 300, 316. It presented, as did the *Fairbank, Hvoslef,* and *Thames & Mersey Ins. Co.* cases, a question under Art. I, § 9, cl. 5 of the Constitution, which provides, "No Tax or Duty shall be laid on Articles exported from any State."

the port. But when the tax is on activities connected with the export or import the range of immunity cannot be so wide.

To export means to carry or send abroad; to import means to bring into the country. Those acts begin and end at water's edge. The broader definition which appellant tenders distorts the ordinary meaning of the terms. It would lead back to every forest, mine, and factory in the land and create a zone of tax immunity never before imagined. For if the handling of the goods at the port were part of the export process, so would hauling them to or from distant points or perhaps mining them or manufacturing them. The phase of the process would make no difference so long as the goods were in fact committed to export or had arrived as imports.

Appellant claims that loading and unloading are a part of its activities. But close examination of the record indicates that it merely rents a crane for loading and unloading and does not itself do the stevedoring work. Hence we need not decide whether loading for export and unloading for import are immune from tax by reason of the Import-Export Clause. Cf. *Joseph* v. *Carter & Weekes Co.,* 330 U. S. 422.

We do conclude, however, that any activity more remote than that does not commence the movement of the commodities abroad nor end their arrival and therefore is not a part of the export or import process.

The objection to Maryland's tax on the ground that interstate commerce is involved is not well taken. It is settled that a nondiscriminatory gross receipts tax on an interstate enterprise may be sustained if fairly apportioned to the business done within the taxing state (see *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 255) and not reaching any activities carried on beyond the borders of the state. Where transportation is con-

cerned, an apportionment according to the mileage within the state [3] is an approved method. *Greyhound Lines* v. *Mealey,* 334 U. S. 653, 663.

*Affirmed.*

THE CHIEF JUSTICE took no part in the consideration or decision of this case.

By MR. JUSTICE JACKSON, whom MR. JUSTICE FRANK-FURTER joins, reserving judgment.[†]

In this case, I reserve judgment in the belief that today's decision of the Court may be found, upon consideration of matters not briefed or argued, to be untenable.

One of the fundamental federal policies, established by the Constitution itself, is that "No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another . . . ." Art. I, § 9, cl. 6. This policy is further implemented by a requirement that federal duties, imposts and excises be uniform (Art. I, § 8, cl. 1), and by a prohibition of any federal tax or duty on articles exported from a state (Art. I, § 9, cl. 5). But this policy of equality of access to the high seas can also be upset by the states. Hence the Constitution forbids any state, without the consent of Congress, to lay any imposts or duties on imports or exports, except to pay the cost of inspection laws. Art. I, § 10, cl. 2.

This detailed constitutional concern about exports and imports is a manifestation of a realistic recognition that a state or city with a safe harbor sits at a gateway with not only an inevitable natural advantage, but also a

---

[3] The tax required of appellant is "upon such proportion of its gross earnings as the length of its line in this State bears to the whole length of its line." § 95 (b), *supra,* note 1.

[†] [This opinion applies also to No. 205, *Western Maryland R. Co.* v. *Rogan, post,* p. 520.]

strategic one which may be exploited if not restrained. Political influence of wealthy and populous port areas was feared in the making of federal law, hence the restrictions on Congress. The disposition of cities and states to. exploit their location astride the Nation's portals also was feared, hence the restriction on the states.

If the roads to the ports may be obstructed with local regulation and taxes, inland producers may be made to pay tribute to the seaboard for the privilege of exportation, and the longer the road to port, the more localities that may lay burdens on the passing traffic. The evident policy of the Constitution is to avoid these burdens and maintain free and equal access to foreign ports for the inland areas. If the constitutional policy can be avoided by shifting the tax from the exported article itself to some incident such as carriage, unavoidable in the process of exportation, then the policy is a practical nullity. I think prohibition of a tax on exports and imports goes beyond exempting specific articles from direct ad valorem duties— it prohibits taxing exports and imports as a process.

This is a matter of giving the inland farms and factories a fair access to the sea which will enable them to compete in foreign commerce, as well as to make imports as equally available as possible, regardless of distance from port. Ocean rates to a given foreign port are the same from all Atlantic ports, so that any differences in the costs of reaching the coast from the inland cannot be offset and represent net differences in the costs of reaching foreign markets.

Congress, the Interstate Commerce Commission, this Court, and American rail and motor carriers have all concurred in the development of rate structures on the premise that exports are to be recognized as such from the time they are delivered to the carrier for export and not merely when they reach the water's edge. There is a wealth of statutory material relating to the carriage of goods for

export by railroads, motor carriers, and shipping companies.* Railroads have established lawful tariffs for export goods substantially less than for like goods destined for local markets. *Texas & P. R. Co.* v. *I. C. C.,* 162

*As demonstrative that Congress is vitally concerned about exports and imports, see 15 U. S. C. § 173, respecting the annual report on statistics of commerce required of the Director of the Bureau of Foreign and Domestic Commerce, in which he must outline the "kinds, quantities, and values" of all articles exported or imported, showing the exports to and imports from each foreign country and their values, the exports being required to be broken down into those manufactured in the United States and their value, and those manufactured in other countries and their value.

Also, although the Interstate Commerce Act does not apply to carriers engaged in foreign commerce insofar as their carriage beyond the limits of the United States is concerned, 49 U. S. C. § 902 (i) (3); 49 C. F. R. § 141.67, their state-side activities have received considerable attention. Chapter 12, Part III of the Act, relating to water carriers, defines "common carrier by water" as "any person which holds itself out to the general public to engage in the transportation by water in interstate *or foreign commerce* of passengers or property . . . ." (Emphasis supplied.) 49 U. S. C. § 902 (d). Section 905 (b) of the same Title states: "It shall be the duty of common carriers by water to establish reasonable through routes . . . with common carriers by railroad . . . and just and reasonable rates . . . applicable thereto . . . . Common carriers by water may establish reasonable through routes and rates . . . with common carriers by motor vehicle. . . ." And § 905 (c) provides that, "It shall be unlawful for any common carrier by water to . . . give . . . any undue or unreasonable preference or advantage to any particular person, port, . . . territory, or description of traffic . . . ."

Further congressional concern is evidenced in 49 U. S. C. § 906 (a): "Every common carrier by water shall file with the Commission, and print, and keep open to public inspection tariffs showing all rates, fares, charges, classifications, rules, regulations, and practices for the transportation in interstate or foreign commerce of passengers and property between places on its own route, and between such places and places on the route of any other such carrier or on the route of any common carrier by railroad or by motor vehicle, when a through route and joint rate shall have been established. . . ." See also 49

U. S. 197; *Texas & P. R. Co.* v. *United States*, 289 U. S. 627. In the latter case, this Court recognized that export and import shipments, although not made on through bills, might lawfully be transported at rates below those charged for domestic traffic between the same points. *Id.*, at 636. The differential, I believe, is sometimes as much as fifty percent of the local tariff over the same route. Of course, if the export character of the goods is not to be recognized until they are ready to board or have boarded ship, this is a rank discrimination against local shippers quite without justification.

What Maryland has done, if these goods while in transit do constitute exports, is to tax gross proceeds of their transportation and handling, not merely the profits therefrom. This adds directly to the cost of their reaching ship-side, and the greater distance they travel, the greater possible accumulation of tax burden. Clearly, this is an obstruction in the path of the federal policy.

However, the effect of the federal policy on the validity of the Maryland tax was not advanced in the courts below nor here by railroad counsel, so I do not wish to express a final view on the matter. But I suspect today's decision will cause mischief in quarters we have not considered.

---

U. S. C. § 6, par. (12), providing: "If any common carrier subject to this chapter and chapters 8 and 12 of this title enters into arrangements with any water carrier operating from a port in the United States to a foreign country . . . for the handling of through business between interior points of the United States and such foreign country, the Commission may by order require such common carrier to enter into similar arrangements with any or all other lines of steamships operating from said port to the same foreign country."

The ever-present concern with through routes and joint rates would appear a strong indication that the Congress regards goods as in export from the time they are first consigned to a carrier for a foreign destination, not from the time they reach the ship on which they are to be carried.