## INTERNATIONAL BUSINESS MACHINES CORPORATION, Plaintiff,

v.

## The UNITED STATES, Defendant.

### No. 388–89T.

United States Court of Federal Claims.

June 23, 1994.

Andrew W. Singer, Washington, DC, attorney of record for plaintiff.

Steven I. Frahm, Washington, DC, attorney of record for defendant.

## OPINION

LYDON, Senior Judge:

In this litigation, International Business Machines Corporation (IBM) seeks to recover deficiencies assessed by the Internal Revenue Service after the Service determined that IBM failed to pay a four percent excise tax on premiums paid to foreign insurers that issued policies covering products IBM sold to its foreign subsidiaries. No facts are in dispute, and each party has moved for summary judgment. The issue presented in the summary judgment motions is whether the excise tax on foreign insurance premiums violates the constitutional prohibition against taxing exports. Because the court agrees with IBM that the tax at issue in this case is prohibited by the Constitution, the court grants summary judgment in favor of IBM.

### I

*Sales of IBM Products Outside the United States*

The following facts have been stipulated by the parties or are otherwise undisputed. IBM is a domestic corporation incorporated under the laws of the State of New York, whose principal place of business is in Armonk, New York. IBM is a developer and manufacturer of sophisticated information processing systems and related products, sold throughout the world. During the tax years at issue in this case, 1975–84, sales of IBM products outside the United States were made through a worldwide network of more than one hundred wholly owned foreign subsidiary corporations. IBM products sold by foreign subsidiaries were manufactured either in their own overseas plants (or in the plants of other IBM foreign subsidiaries) or by IBM at manufacturing plants in the United States.

During the tax years in issue, IBM products manufactured in the United States and sold outside the United States through for-

eign subsidiaries included (but were not limited to) the following items, manufactured at the locations indicated:

| Product | Manufacturing Locations |
|---|---|
| Mainframe computers | Poughkeepsie, NY |
| Tape drives, large printers, magnetic tape | Tucson, AZ |
| Disc drives | San Jose, CA |
| Copiers, toner, supplies | Boulder, CO |
| Intermediate computers | Rochester, MN, Austin, TX |
| Personal computers, keyboards | Austin, TX, Boca Raton, FL |
| Point of sale banking machines, circuit cards | Charlotte, NC |
| Communication devices, cathode ray terminals | Raleigh, NC |
| Semiconductors | Manassas, VA, East Peekskill, NY Burlington, NY |
| Large circuit boards, specialized intermediate computers | Endicott, NY |

Sales outside the United States of IBM products manufactured within the United States were accomplished by a purchase order to IBM from its foreign subsidiary, under which IBM billed the subsidiary and generally shipped the goods directly to the subsidiary's customer. Lower priced goods might be shipped to a consolidation center in the foreign country, and maintained as inventory by the foreign subsidiary to fill future orders. Depending upon the particular product, IBM would fill a subsidiary's order either by (1) building the product to particular specifications contained in a purchase order ("built to order"), or (2) utilizing ongoing production at a factory or inventory warehouse ("built to plan").

Shipment of products from the United States to the foreign customer began by truck on a common carrier (from the manufacturing plant or warehouse). The goods generally were destined for a United States airport (typically, John F. Kennedy in New York for shipments to Europe and the Middle East, Miami International for shipments to Latin America, and San Francisco International for shipments to the Far East), but some shipments were by sea. While traveling within the United States, the products would typically be unloaded at one or more intermediate freight forwarder locations, where they would typically remain for two to five days, but could remain while awaiting space on an airliner for as long as thirty days. The products would be reloaded at the freight forwarders' facilities and continue ultimately to the point of embarkation, where they were loaded onto an airplane or a ship. Once the products reached the air or sea port in the foreign country, they were unloaded, cleared customs, and loaded on trucks for shipment to their final destination.

When foreign subsidiaries purchased IBM products from IBM during the years in issue, the terms of sale called for title to the products (and the risk of loss) to pass from IBM to the subsidiary when the goods cleared customs in the foreign country. The terms of sale also called for the purchasing subsidiary to bear the cost of insuring the products against damage or destruction during shipment.

*Insurance Covering the Shipment of IBM Products Sold to Foreign Subsidiaries*

All U.S.-manufactured products IBM sold to foreign subsidiaries were covered by casualty insurance against damage or destruction during shipment. Insurance was "point to point," that is, it covered the risk of loss to goods during transportation by surface or air transportation from the IBM facility in the United States until delivered to the foreign customer or a foreign consolidation center. In some cases, IBM arranged for the insurance; when it did so, insurance was placed with a U.S. insurance carrier, and the cost was billed to the foreign subsidiary. In other instances, the foreign subsidiary placed the insurance; when it did so, the insurance often was with a foreign carrier, which the subsidiary paid for directly. In all cases, both IBM and its foreign subsidiary were listed as insured beneficiaries.

When a foreign subsidiary obtained its own insurance coverage with a foreign insurer, the policy covered not only shipments to it by IBM from the United States, but shipments of goods purchased from foreign affiliates in other countries as well. The insurer would charge a separate premium to cover each shipment, the amount of which was determined by multiplying the declared value of the particular shipment by the premium rate applicable to that shipment. The premium rate depended on such underwriting factors as the place of origin and destination of the goods, the type of goods involved and how they were packaged, the time and distance of

the trip, the route and mode of transportation, and the amount of material handling expected during the trip.

If damage to an IBM product being shipped to a foreign country occurred while IBM had title to the goods (and the risk of loss), then IBM would be entitled to the insurance proceeds under the insurance policy (whether issued by a U.S. company or a foreign insurer). If the loss occurred, however, after the importing foreign subsidiary acquired title to the products, the insurance proceeds would be payable to the subsidiary. In the latter case, the subsidiary would use the proceeds to pay IBM the full purchase price of the damaged products, or to reimburse itself for the purchase price if IBM had already been paid. Since most IBM products shipped to foreign subsidiaries were packaged in containers, damage was frequently not discovered until after the products arrived at their destination. As a practical matter, it was often impossible to determine when a loss occurred and therefore who was legally entitled to receive the policy proceeds. In most cases involving foreign insurance carriers, therefore, the insurance company simply paid the insurance proceeds to the foreign subsidiary which used the proceeds to pay IBM for the goods.

*The Service's Position During the Audits*

For the tax periods at issue in this litigation, each quarter during the years 1975 through 1984, IBM filed federal excise returns that did not report any liability under § 4371 of the Internal Revenue Code of 1954, a four percent excise tax on premiums paid for certain policies of insurance issued by foreign insurers. On audit, the Service determined that IBM was liable for the § 4371 tax as a result of the policies purchased from foreign insurance companies insofar as those policies applied to IBM products being exported from the United States.

As part of the audit process, IBM requested the Service's District Director to seek technical advice from the Service's National Office on whether the § 4371 tax as applied to IBM's exports was in violation of Article I, § 9, clause 5 of the United States Constitution, which will be referred to throughout this opinion as the Export Clause. In a Technical Advice Memorandum dated May 12, 1982, the National Office rejected IBM's constitutional argument on the grounds that the § 4371 tax was not a "tax" within the meaning of the Export Clause because the primary object of the tax statute was regulatory as opposed to revenue-raising.

On reconsideration, the Service issued a second Technical Advice Memorandum, dated November 6, 1984, reaffirming its earlier position and adding a second argument, that the Export Clause did not restrict application of the § 4371 tax because the incurred risks included some transportation within the United States. The Service found that the Export Clause had no application at all to an export voyage if some portion of the total voyage included an intra-U.S. transportation leg. Because the insurance policies in question here covered not just the overseas portion of the export shipments but also the inland leg from the IBM manufacturing facilities to the U.S. air or sea port, the Service concluded that the Export Clause had no application to any of the shipments. Presently, the government is not relying on the positions advanced by the Service described above.

*The Assessments*

The Service determined that the premiums paid to foreign insurers with respect to U.S. manufactured IBM products sold to its foreign subsidiaries were subject to the tax imposed by § 4371. During the audit, IBM sent questionnaires to its foreign subsidiaries and determined that the premiums paid by them to foreign insurers during the year 1980, allocable to U.S.-manufactured IBM products sold outside the United States, totaled $2,065,137. For expediency in making assessments under § 4371, IBM and the Service agreed that the foreign insurance premiums attributable to such products in each of the years 1975–79 and 1981–84 were the same as the premiums paid in 1980. Accordingly, the Service assessed § 4371 taxes of $82,605 per year (a figure calculated by multiplying the annual premiums by four percent), along with interest and delinquency penalties for each quarter in issue. IBM paid its assessments in full, and timely filed claims for refund. The Service denied these

claims on December 23, 1988. IBM timely filed its action in this court on July 11, 1989. Since then, the government has since abated the penalty assessments and refunded the amounts so assessed to IBM, with interest. The assessments for tax and interest, which are still in dispute, total $1,532,235.87.

*The Present Motions*

The sole question presented by the motions for summary judgment is whether § 4371 is constitutionally impermissible, given the facts agreed to by the parties. Article I, section 9, clause 5 of the United States Constitution, the Export Clause, provides: "No Tax or Duty shall be laid on Articles exported from any State." This provision was intended to free all exportations from the burdens of national taxation.

Section 4371 provides:

There is hereby imposed, on each policy of insurance, indemnity bond, annuity contract, or policy of reinsurance issued by a foreign insurer or reinsurer, a tax at the following rates:

(1) Casualty insurance and indemnity bonds.—4 cents on each dollar, or fractional part thereof, of the premium paid on the policy of casualty insurance or the indemnity bond, if issued to or for, or in the name of, an insured as defined in section 4372(d);

The parties appear to agree that as the terms "foreign insurer," "policy of casualty insurance," and "insured" are defined in § 4372, the premiums on casualty insurance that IBM purchased are facially subject to the tax imposed by § 4371.

**II**

*A. IBM's Argument*

IBM directs the court's attention to *Thames & Mersey Marine Insurance, Co. v. United States*, 237 U.S. 19, 35 S.Ct. 496, 59 L.Ed. 821 (1915), cited for the holding that the Export Clause prohibits the levying of taxes on policies of marine insurance on exports. In *Thames & Mersey*, the taxpayer sought to recover amounts it paid in stamp taxes on policies insuring exports against marine risks. In its analysis, the Court turned quickly to *United States v. Hvoslef*,

237 U.S. 1, 35 S.Ct. 459, 59 L.Ed. 813 (1915), a case decided two weeks before *Thames & Mersey*. In *Hvoslef,* the Court invalidated a tax levied on charter parties which were exclusively for the carriage of cargo from state ports to foreign ports because the tax was essentially a tax on exports. The *Thames & Mersey* court said that its issue followed directly, for the question presented by both *Hvoslef* and *Thames & Mersey* was: "Is the tax upon such policies so directly and closely related to the 'process of exporting' that the tax is in substance a tax upon the exportation and hence within the constitutional prohibition?" *Thames & Mersey,* 237 U.S. at 25, 35 S.Ct. at 498. Put another way by the Court, the constitutionality of this tax depended on "whether policies of insurance against marine risks during the voyage to foreign ports are not so vitally connected with exporting that the tax on such policies is essentially a tax upon the exportation itself." *Id.* at 26, 35 S.Ct. at 498. Answering this question by examining "the exigencies of trade [to] determine what is essential to the process of exporting," the Court held that marine insurance policies are so vitally connected to the export process that a tax on the policies amounts to a tax on the exports themselves, in contravention of the Export Clause. *Cf. Fairbank v. United States,* 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862 (1901) (stamp tax on bill of lading for exported goods is in effect a tax on the articles included in the bill of lading, and is therefore a tax on exports).

The second prong of IBM's contention is that as far as certain taxes are proscribed by the Export Clause of the Constitution, § 4371 is such a tax. IBM states that the predecessor of § 4371 was a stamp tax enacted as part of a comprehensive wartime revenue bill, the Revenue Act of 1918. Ch. 18, § 1107, 40 Stat. 1057, 1138. The excise tax on foreign insurers was re-enacted as part of a World War II revenue bill, the Revenue Act of 1942. Ch. 619, § 502, 56 Stat. 798, 955. A House report discussing this revenue measure, cited by IBM, stated: "It is believed that the revised provision will yield an appreciable amount of revenue, and at the same time eliminate an unwarranted compet-

itive advantage now favoring foreign insurers [who are not subject to income tax]." H.R.Rep. No. 2333, 77th Cong., 2d Sess. 61 (1942).

Finally, IBM argues that export protection begins as soon as goods enter the "export stream," and accordingly the prohibition against taxation that burdens exports extends to the payment of taxes on premiums by IBM in this case. The "export stream" is the final, continuous journey out of the country, and tax immunity attaches as soon as the journey begins. *Dep't of Revenue v. Ass'n of Washington Stevedoring Cos.,* 435 U.S. 734, 752, 98 S.Ct. 1388, 1400, 55 L.Ed.2d 682 (1978). Referring again to *Thames & Mersey,* IBM argues that the payment of these taxes is so directly and closely related to the process of exporting that the tax is in substance a tax upon the exportation, and thus constitutionally prohibited. Section 4371, argues IBM, falls outside the spirit of the Supreme Court's thoughts in *Fairbank v. United States,* 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862 (1901). There, the court stated:

> [T]he purpose of the restriction is that exportation, all exportation, shall be free from national burden.... [I]t is clear that the framers of the Constitution intended not merely that exports should not be made a source of revenue to the National Government, but that the National Government should put nothing in the way of burden upon such exports.

*Id.* at 292–93, 21 S.Ct. at 652.

*B. The Government's Argument*

As mentioned previously, the government is not presently advancing the two positions defended by the Service's National Office that it took on § 4371 during the audit process, namely, that § 4371 does not impose a tax that has any constitutional ramifications because its primary purpose is regulatory instead of revenue-raising, and that *Thames & Mersey* is distinguishable because these shipments were not pure exportation in that they included an inland leg from a plant inside the United States to a port.

In its cross-motion, the government does not disagree with the admonition in *Fairbank* that exports cannot be burdened by taxation that interferes with the export process. Where IBM goes astray, argues the government, is in its argument that *Thames & Mersey* controls this case. The government says that *Thames & Mersey* is silent on the question of whether the excise tax imposed by § 4371 targeted exports in a discriminatory fashion or whether the tax was facially neutral in this regard. The thrust of the government's motion for summary judgment is that *Thames & Mersey* has been superseded by Supreme Court decisions that have shifted the critical "Export Clause" question to whether a tax discriminates against exports in their capacity as exports.

■ The government's argument is premised on its interpretation of two related Supreme Court decisions. In *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976), the State of Georgia assessed ad valorem property taxes against Michelin's inventory of imported tires and tubes. Michelin argued that the ad valorem tax was prohibited by the "Import–Export Clause" of the Constitution, Article I, § 10, clause 2, which provides: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports and Exports, except what may be absolutely necessary for executing its own inspection Laws...." The Court rejected Michelin's proposition, stating: "Nothing in the history of the Import–Export Clause even remotely suggests that a nondiscriminatory ad valorem property which is also imposed on imported goods that are no longer in transit was the type of exaction that was regarded as objectionable by the Framers of the Constitution." *Id.* at 286, 96 S.Ct. at 541.

Critical to the Court's holding in *Michelin* was its discussion of *Low v. Austin,* 80 U.S. (13 Wall.) 29, 20 L.Ed. 517 (1872). The Court characterized *Low* as "the leading decision of this Court holding that the States are prohibited by the Import–Export Clause from imposing a nondiscriminatory ad valorem property tax on imported goods until they lose their character as imports and become incorporated into the mass of property in the State." *Michelin,* 423 U.S. at 282, 96 S.Ct. at 539. *Low,* the Court continued, improperly expanded the prohibition of the Im-

port–Export Clause, rejecting the more reasoned views expressed by Justice Marshall in *Brown v. Maryland,* 25 U.S. (12 Wheat.) 419, 6 L.Ed. 678 (1827), and Justice Taney in the *License Cases,* 46 U.S. (5 How.) 504, 12 L.Ed. 256 (1847), that an examination of the origins of the Clause "makes crystal clear that the prohibition applied only to state exactions upon imports *as imports* and did not apply to nondiscriminatory ad valorem property taxes." *Michelin,* 423 U.S. at 300, 96 S.Ct. at 547. Accordingly, the Court found that *Low* was wrongly decided and explicitly overruled it. *Id.* at 301, 96 S.Ct. at 548.

What in *Michelin* the Supreme Court said about the taxation of imports *qua* imports, it extended to the taxation of exports *qua* exports in *Washington Stevedoring.* There, the Court resumed a discussion it began in *Michelin.* The Court noted that *"Michelin* initiated a different approach to Import–Export Clause cases. It ignored the simple question whether the tires and tubes were imports. Instead, it analyzed the nature of the tax to determine whether it was an 'Impost or Duty.'" *Washington Stevedoring,* 435 U.S. at 752, 98 S.Ct. at 1400. The import tax in *Michelin* was upheld because it did not offend the three main concerns of the Framers of the Import–Export Clause: the government speaking with one voice when regulating commercial relations with foreign governments; preventing federal sources of import revenues from being diverted to the states; and preventing states from levying taxes on citizens of other states by taxing goods merely flowing through their ports to other states.

Although the Court in *Washington Stevedoring* recognized that there were some formal factual distinctions between it and *Michelin,* it extended the *Michelin* "three concerns" analysis to taxation involving exports. The Court pointed out that an export tax need only be measured against the first and third concerns: the export-tax ban of the Import–Export Clause does not serve the second concern, protection of federal revenues, because that objective is satisfied by the Export Clause of Article I, § 9. In sum, the Court decided that an export tax should be tested for its conformance with the first and third policies of the Import–Export Clause, and if the constitutional interests are not disturbed, the tax should not be considered an "Impost or Duty" prohibited by the Constitutional ban.

Among the distinctions drawn by the *Washington Stevedoring* Court between its facts and those in *Michelin* was that in *Michelin* the tax fell on the goods themselves, whereas in *Washington Stevedoring* the tax fell on stevedoring, the business of loading and unloading ships. The Court noted that a tax on stevedoring does not relate to the value of the goods being transported, and therefore cannot be considered a tax on the goods themselves. *Id.* at 757, 98 S.Ct. at 1402. To reach this conclusion, *Washington Stevedoring* turned briefly to *Canton Railroad Co. v. Rogan,* 340 U.S. 511, 71 S.Ct. 447, 95 L.Ed. 488 (1951), in which the Court upheld a gross-receipts tax on a railroad that engaged in a variety of services relating to importing and exporting on the grounds that the immunity of services incidental to importing and exporting was not as broad as the immunity of the goods themselves, a distinction described in *Canton Railroad* that found favor in *Washington Stevedoring.*

Of course, no bright-line test for distinguishing between goods and related services emerged from *Canton Railroad,* but as the Court in *Washington Stevedoring* noted, *Canton Railroad* did distinguish the tax it upheld from other taxes which the Court had previously invalidated. Among the cases distinguished was *Thames & Mersey.* In the words of the *Washington Stevedoring* Court:

In [the cases in which the Court had previously struck down taxes,] the State had taxed either the goods or activity so connected with the goods that the levy amounted to a tax on the goods themselves.... [T]he stamp tax on bills of lading in *Fairbank* effectively taxed the goods because the bills represented the goods. The basis for distinguishing *Thames & Mersey* is less clear because there the tax fell upon marine insurance policies. Arguably, the policies had a value apart from the value of the goods. In distinguishing that case from the taxation

of stevedoring activities, however, one might note that the value of goods bears a much closer relation to the value of insurance policies on them than to the value of loading and unloading ships. *Washington Stevedoring,* 435 U.S. at 756 n. 21, 98 S.Ct. at 1402 n. 21.

In its motion, the government suggests that a reading of *Washington Stevedoring* and the cases leading up to it indicates that there has been a fundamental revision in the way the Supreme Court approaches cases that invoke both the Import–Export Clause and the Export Clause. It argues that there is no meaningful difference between a tax on the proceeds of stevedoring services and a tax on premiums paid for policies of casualty insurance, a transaction the government describes as being incidental to the process of exporting. Taking its cue from *Michelin,* the government says that as applied to IBM in this case the § 4371 tax is "non-discriminatory" because it doesn't "discriminate" against exports, *i.e.,* the tax doesn't target exports as exports but instead is a generally applicable tax on insurance policies written by foreign insurers that applies regardless of whether the insured goods are in the export stream, and because the tax as such is "nondiscriminatory" it does not run afoul of the Export Clause.

### III

Having carefully considered the parties' briefs and the cases relied on therein, the court cannot agree with the government that *Michelin* and *Washington Stevedoring* control the facts of this case. Plainly enough, the parties agree that § 4371 imposes a "tax," as that term is generally used and understood. And, the court agrees with IBM that the tax imposed by § 4371 is a tax that amounts to a tax on exports. That the imposition of an excise tax on insurance that must be purchased to secure against the risks amounts to a tax on the goods themselves was recognized years ago by the Supreme Court, which wrote that "[i]t cannot be doubted that insurance during the voyage is by virtue of the demands of commerce an integral part of the exportation; the business of the world is conducted upon this basis."

*Thames & Mersey,* 237 U.S. at 26, 35 S.Ct. at 498.

Thus, because the § 4371 tax is essentially a burden on the exportation process under the rule of *Thames & Mersey,* to avoid application of the rule and prevail on its motion the government must demonstrate either that *Thames & Mersey* has been explicitly overruled, or if it has not been, that later precedent more properly controls. The court does not think that the government has successfully demonstrated either of these propositions.

The government argues that *Thames & Mersey* has been overruled because *Washington Stevedoring* overruled its decisions in *Puget Sound Stevedoring Co. v. State Tax Comm'n,* 302 U.S. 90, 58 S.Ct. 72, 82 L.Ed. 68 (1937) and *Joseph v. Carter & Weekes Stevedoring Co.,* 330 U.S. 422, 67 S.Ct. 815, 91 L.Ed. 993 (1947), two cases in which the Court invalidated state taxes on the proceeds from stevedoring interstate and international cargoes because they violated the Import–Export Clause. A partial dissent and partial concurrence in *Carter & Weekes* held that the Import–Export Clause prevented the stevedoring tax from applying to cargoes to and from foreign ports, invoking *Thames and Mersey* as grounds for its conclusions regarding exports. The government maintains that because *Washington Stevedoring* overruled *Carter & Weekes,* then *Thames & Mersey* must also have been overruled.

The court rejects this argument. *Carter & Weekes* was explicitly overruled in *Washington Stevedoring.* The Court in *Michelin* wrote many pages to explain in detail why it was overruling the long-standing rule of *Low v. Austin. Washington Stevedoring* does specifically overrule two cases and endorses a new way of examining cases that involve the Import–Export Clause, but the court does not read *Washington Stevedoring* as stating that the Court has abandoned the rule it expanded in *Thames & Mersey* in an analysis of the Export Clause. The court must adhere to the accepted practice of following Supreme Court precedent unless the Supreme Court clearly states that it is overruling earlier cases and explains why it is doing so. *Rodriguez de Quijas v. Shear-*

*son/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.") *Washington Stevedoring* overruled two prior decisions that relied on the Import–Export Clause to invalidate taxes on stevedoring. In the absence of explicit instruction from the Supreme Court that its long-standing approach to evaluating challenges under the Export Clause should be disregarded, the court declines to presume that such an instruction has been implicitly given.

Furthermore, the court is not inclined to read *Washington Stevedoring* as overruling *Thames & Mersey* when the Court in *Washington Stevedoring* cites *Thames & Mersey* as a precedential case that in the present context had to be distinguished. In its discussion of *Canton Railroad,* the Court in *Washington Stevedoring* drew parallels to that earlier case, noting that:

> [t]axation in neither [stevedoring nor railroad services] relates to the value of goods, and therefore in neither can it be considered taxation on the goods themselves. The force of *Canton R. Co.* therefore prompts the conclusion that the *Michelin* policy analysis should not be discarded merely because the goods are in transit, at least where the taxation falls upon a service distinct from the goods and their value.

*Washington Stevedoring*, 435 U.S. at 757, 98 S.Ct. at 1403. Clearly, the Court no longer considers a tax on stevedoring to be a tax on exports because stevedoring is a service whose value is not necessarily tied to the value of the goods it serves. In that same discussion, however, the Court distinguished a tax on stevedoring from the tax on the marine insurance policies invalidated in *Thames & Mersey,* stating that "the value of goods bears a much closer relation to the value of insurance policies on them than to the value of loading and unloading ships." *Id.* at 756 n. 21, 98 S.Ct. at 1402 n. 21.

Thus, even if the government is correct in its assertion that all taxes that involve exports, whether considered in light of the Export Clause or the Import–Export Clause, should be examined to see if they discriminate against exports *qua* exports, it appears that in the Court's view a tax such as that imposed by § 4371 could indeed be considered a tax on exports in their capacity as exports. The present case is distinguishable from *Michelin* and *Washington Stevedoring:* in *Michelin* the tires had left the import stream and were held to be beyond the import stream and thus outside the scope of the Import–Export Clause, and in *Washington Stevedoring* the Court said that the Import–Export Clause was not violated because stevedoring bore no significant relationship to the goods transported. In the present case, the casualty insurance policies were at all times within the export stream and were significantly related to the exportation process. Whether the § 4371 tax would be impermissible even without the support of *Thames & Mersey* is, we realize, not stated dispositively by the Court, but there is nothing in *Washington Stevedoring* that indicates that *Thames & Mersey* and the connection drawn in that case between insurance policies and the value of goods have been banished into irrelevance.

## IV

For the reasons discussed above, the court finds that the § 4371 tax imposed on IBM violates the terms of the Export Clause. Plaintiff's motion for summary judgment is granted, and defendant's motion for summary judgment is denied. The parties are directed to confer and agree on the judgment award that should be entered in favor of the plaintiff. The parties shall advise the court in this regard within thirty days.