BRYSON, Circuit Judge.
 

 This tax case raises a question concerning the constitutionality of a federal statute. The government, as appellant, acknowledges that a 1915 Supreme Court decision is directly on point and that, if the decision is still good law, the statute at issue must be held unconstitutional as applied. The government argues, however, that the 1915 decision has been undermined by subsequent Supreme Court authority, and it asks us to regard that case as no longer binding. We do not regard it as clear that the Supreme Court’s more recent decisions have repudiated the 1915 decision. We therefore affirm the decision of the Court of Federal Claims invalidating the taxes at issue in this case.
 

 I
 

 During the pertinent tax years, 1975 through 1984, International Business Machines Corporation (IBM) sold information processing systems and related products to domestic and foreign customers. With respect to many of its foreign sales, IBM manufactured products in the United States, sold them to its foreign subsidiaries, and shipped them either directly to the foreign customers or to consolidation centers in the customers’ countries. The products were shipped by common carrier from IBM’s domestic manufacturing plants to domestic ports or airports, where they were loaded onto ships or airplanes. Upon arrival in the foreign country, the products were cleared through customs and shipped to the foreign customers or consolidation centers. Title to the products passed from IBM to its foreign subsidiaries when the goods cleared customs in the foreign countries. In some cases, IBM’s foreign subsidiaries purchased insurance from foreign insurers for the products during their shipment; in those cases, both IBM and the foreign subsidiaries were listed as insured beneficiaries.
 

 The Internal Revenue Service audited IBM’s federal excise tax returns for 1975 through 1984 and determined that, as a beneficiary, IBM was subject to a four percent excise tax on the premiums paid to foreign insurers. The excise tax was assessed under the authority of 26 U.S.C. § 4371, which imposes a four percent tax on each policy of casualty insurance issued by a foreign insurer to a domestic entity for risks or liabilities wholly or partly within the United States. Section 4371 applies only to insurance obtained from foreign insurers who are not subject to federal income tax; it was designed to offset the advantage that such insurers would otherwise have over domestic insurance companies that are subject to domestic income taxes.
 
 See
 
 H.R.Rep. No. 2333, 77th Cong., 2d Sess. 61 (1942).
 

 IBM paid the assessed excise taxes and filed suit in the Court of Federal Claims, seeking a full refund of the taxes paid. In a thorough opinion on which we rely, the Court of Federal Claims held that the excise tax on premiums charged by foreign insurers, as applied to casualty insurance on goods in the export stream, was in effect a tax upon the exported products themselves and thus ran afoul of the Export Clause of the Constitution, Article I, Section 9, Clause 3.
 
 International Business Machines Corp. v. United States,
 
 31 Fed.Cl. 500 (1994). In so holding, the court relied on the Supreme Court’s decision in
 
 Thames & Mersey Marine Insurance Co. v. United States,
 
 237 U.S. 19, 35 S.Ct.
 
 *1236
 
 496, 59 L.Ed. 821 (1915), which struck down a similar tax on marine insurance policies.
 

 The Court of Federal Claims rejected the government’s argument that the analysis in the
 
 Thames & Mersey
 
 case has been repudiated in subsequent Supreme Court decisions, and that the excise tax imposed on foreign insurance policies should be upheld as a permissible tax of general application that does not discriminate against exports. Instead, the court concluded that casualty insurance is an integral part of commercial exportation, that the value of exported goods bears a close relationship to the value of insurance policies on those goods, and that the tax imposed in this case therefore amounted to a tax on exports, prohibited by the Export Clause.
 

 II
 

 This ease presents the question whether the Supreme Court’s analysis of the Export Clause in the
 
 Thames & Mersey
 
 case retains its vitality in the wake of subsequent Supreme Court decisions involving the Import-Export Clause, Article I, Section 10, Clause 2, in which the Court has modified its approach to issues arising under that Clause.
 

 A
 

 The Export Clause provides, in one sentence: “No Tax or Duty shall be laid on Articles exported from any State.” Along with the Import-Export Clause, which prohibits any State, without the consent of Congress, from laying “any Imposts or Duties on Imports or Exports,” the Export Clause was “one of the compromises which entered into and made possible the adoption of the Constitution.”
 
 Fairbank v. United States,
 
 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862 (1901).
 

 At the Constitutional Convention, strong sentiments were voiced on the subject of export taxes. Representatives of the Southern States expressed concern that a Congress controlled by the more numerous and populous Northern States would impose burdensome levies on Southern exports. Charles Pinckney of South Carolina insisted that security against taxes on exports be included in the Constitution, on a par with security against the emancipation of the slaves. 2
 
 The Records of the Federal Convention of 1787
 
 95 (Max Farrand ed. 1927). According to Madison’s notes, George Mason of Virginia likewise “urged the necessity of connecting with the power of levying taxes duties & c, ... that no tax should be laid on exports____ He hoped the [Northern] States did not mean to deny the Southern this security.”
 
 Id.
 
 at 305. Concern over the risk of abuse of the power to tax exports was expressed even by a Northern delegate, Elbridge Gerry of Massachusetts, who stated his view that “the legislature could not be trusted with such a power. It might ruin the Country. It might be exercised partially, raising one and depressing another part of it.”
 
 Id.
 
 at 307.
 

 Acknowledging the importance of the Export Clause and its flat prohibitory language, the Supreme Court has consistently given the Clause a broad construction. In one of the first major decisions applying the Export Clause, the Court struck down a stamp tax imposed on bills of lading relating to goods designated for foreign export. Such a tax, the Court explained, “is in substance and effect equivalent to a tax on the articles included in that bill of lading, and, therefore, a tax or duty on exports, and in conflict with the constitutional prohibition.”
 
 Fairbank v. United States,
 
 181 U.S. at 312, 21 S.Ct. at 660.
 

 In applying that test, the Court- distinguished between taxes imposed on property prior to its entering the export stream and taxes imposed, directly or indirectly, on property during the export process. For example, in
 
 Cornell v. Coyne,
 
 192 U.S. 418, 24 S.Ct. 383, 48 L.Ed. 504 (1904), the Court upheld a tax on filled cheese that was imposed prior to its exportation, holding that a nondiscriminatory tax on manufactured cheese was not unconstitutional simply because the manufacturer intended from the outset to export the cheese. By contrast, in
 
 United States v. Hvoslef,
 
 237 U.S. 1, 35 S.Ct. 459, 59 L.Ed. 813 (1915), the Court struck down a tax imposed on charter parties for the carriage of cargo to foreign ports. As applied to the charter parties for export at issue in the case before it, the Court held
 
 *1237
 
 that the tax was “nothing else than a tax on exportation” and thus prohibited by the Export Clause.
 
 Id.
 
 at 18, 35 S.Ct. at 464. It did not matter, the Court held, that the statute in question was not limited to charter parties for exports, but applied to charter parties generally; even if the statute in question created a nondiscriminatory tax of general application, it was unconstitutional to the extent that it was applied to charter parties for export, because in so doing, it had the prohibited effect of imposing a tax on exports.
 
 Id.
 

 Two weeks after
 
 Hvoslef
 
 the Supreme Court in the
 
 Thames & Mersey
 
 case struck down a stamp tax on policies of marine insurance to the extent that it applied to policies insuring exports. The Court put the question as whether “the tax upon such policies [is] so directly and closely related to the ‘process of exporting’ that the tax is in substance a tax upon the exportation and hence within the constitutional prohibition.” 237 U.S. at 25, 35 S.Ct. at 498. Finding that marine insurance “is by virtue of the demands of commerce an integral part of the exportation,”
 
 id.
 
 at 26, 35 S.Ct. at 499, the Court concluded that the tax at issue, as a practical matter, fell upon the exporting process and therefore was invalid under the Export Clause.
 

 B
 

 The government concedes that if
 
 Thames & Mersey
 
 is still good law, the assessments at issue in this case are invalid. In the government’s view, however, subsequent decisions construing the Import-Export Clause have rendered
 
 Thames & Mersey
 
 analytically unsound. The government contends that the Export Clause should be interpreted not to outlaw taxes of general application, as long as they do not discriminate against exported goods or services relating to exports. The government therefore invites this court to disregard the Supreme Court’s contrary analysis of the Export Clause in
 
 Thames & Mersey.
 

 In pressing its case against
 
 Thames & Mersey,
 
 the government relies particularly on two decisions construing the Import-Export Clause,
 
 Michelin Tire Corp. v. Wages,
 
 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976), and
 
 Department of Revenue v. Association of Washington Stevedoring Companies,
 
 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978). Prior to the
 
 Michelin
 
 decision, the Supreme Court viewed the Import-Export Clause as ereeting a general prohibition against state taxation of imports and exports. The focus of inquiry was on whether the impact of the tax fell on goods that were in foreign commerce; if it did, the tax was forbidden (except in the limited circumstances permitted by the Clause itself).
 
 See Almy v. California,
 
 65 U.S. (24 How.) 169, 16 L.Ed. 644 (1861);
 
 Low v. Austin,
 
 80 U.S. (13 Wall.) 29, 20 L.Ed. 517 (1872).
 

 In the
 
 Michelin
 
 case, the Court jettisoned that mode of analysis and adopted a new approach based on the text and purposes of the Import-Export Clause. Overruling its prior decision in
 
 Low v. Austin,
 
 the Court held that a nondiscriminatory ad valorem property tax does not run afoul of the Import-Export Clause simply because it is applied to goods that have recently been imported. The Court noted that the Import-Export Clause bans only “Imposts or Duties”; it “is not written in' terms of a broad prohibition of every ‘tax.’ ”
 
 Michelin,
 
 423 U.S. at 290, 96 S.Ct. at 543. Moreover, the Court explained that the Framers adopted the Import-Export Clause to ensure that the federal government would speak with one voice in regulating commerce with foreign nations, to preserve import revenues for the federal government, and to protect states without port facilities from exploitation by those directly engaged in foreign commerce. None of those concerns, the Court stated, is triggered by a nondiscriminatory ad valorem tax “which is also imposed on goods that are no longer in import transit.” 423 U.S. at 286, 96 S.Ct. at 541.
 

 The Supreme Court used similar reasoning to reach a similar result two years later in the
 
 Washington Stevedoring
 
 ease. In that case, which involved an Import-Export Clause challenge to a state tax on stevedoring services, the Court rejected an argument that the tax was impermissible when applied to stevedoring services relating to foreign imports and exports. A nondiscriminatory
 
 *1238
 
 tax on stevedoring services was not an “impost or duty” on imports or exports, the Court concluded, but simply a local tax on services that happened to facilitate the importation and exportation of goods.
 

 Relying on
 
 Michelin
 
 and
 
 Washington Stevedoring,
 
 the government argues that Section 4371 should be upheld as a nondiscriminatory tax that does not specifically target exports and therefore is not an invalid “tax or duty” laid “on articles exported from any State.” Although
 
 Michelin
 
 and
 
 Washington Stevedoring
 
 arose under the Import-Export Clause, rather than the Export Clause, the government argues that the Supreme Court is likely to follow a similar analysis under the Export Clause when the occasion arises.
 

 The government finds additional support for its position in cases decided under the Commerce Clause. As under the Import-Export Clause, early Commerce Clause cases struck down even nondiscriminatory taxes on the privilege of doing business in a state when applied to an activity that was part of interstate commerce.
 
 See, e.g., Spector Motor Service v. O’Connor,
 
 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951);
 
 Robbins v. Shelby County Taxing Dist.,
 
 120 U.S. 489, 7 S.Ct. 592, 30 L.Ed. 694 (1887). That line of cases, however, was overturned in
 
 Complete Auto Transit, Inc. v. Brady,
 
 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), in which the Court held that the Commerce Clause is not violated by the. application of a fairly apportioned and nondiscriminatory tax on the privilege of doing business in a state, even if the tax is applied to an interstate activity.
 

 The government points out that in
 
 Hvoslef
 
 (and by extension in
 
 Thames & Mersey,
 
 which relied on
 
 Hvoslef)
 
 the Court invoked the line of Commerce Clause authority that was disapproved in
 
 Complete Auto.
 
 The government also points out that the Court’s analysis of the Export Clause in
 
 Thames & Mersey
 
 paralleled the Court’s then-governing approach to the Import-Export Clause, which has also been disapproved. Accordingly, the government submits, the analytical foundations of
 
 Thames & Mersey
 
 have been removed, and its demise is a foregone conclusion.
 

 We are not so sure. While the Supreme Court may at some point reconsider
 
 Thames & Mersey,
 
 it has not clearly signaled that it is ready to do so. Support for the continuing vitality of
 
 Thames & Mersey
 
 can be found both in the Court’s Import-Export Clause decisions and in the distinctions in language and policy between the Import-Export Clause and the Export Clause.
 

 In
 
 Canton Railroad Co. v. Rogan,
 
 340 U.S. 511, 71 S.Ct. 447, 95 L.Ed. 488 (1951), a predecessor of the
 
 Washington Stevedoring
 
 case, the Supreme Court upheld state taxes on transportation services as applied to goods being imported or exported. The Court was careful to distinguish
 
 Thames & Mersey,
 
 noting that the tax on marine insurance policies addressed in
 
 Thames & Mersey
 
 was “the equivalent of a direct tax on the articles.” 340 U.S. at 513, 71 S.Ct. at 448. And in
 
 Washington Stevedoring,
 
 the Court recognized that the tax on insurance policies in
 
 Thames & Mersey
 
 was on an “activity so connected with the goods that the levy amounted to a tax on the goods themselves.” 435 U.S. at 756 n. 21, 98 S.Ct. at 1402 n. 21. Although the
 
 Washington Stevedoring
 
 Court acknowledged that “the basis for distinguishing
 
 Thames & Mersey
 
 is less clear” than for other similar cases (because marine insurance policies arguably have a value apart from the value of the insured goods), the Court nonetheless noted that “the value of goods bears a much closer relation to the value of insurance policies on them than to the value of loading and unloading ships.”
 
 Id.
 
 Thus, while the Court’s treatment of
 
 Thames & Mersey
 
 may reflect less than a ringing endorsement of that decision, the Court’s characterization of
 
 Thames & Mersey
 
 as distinguishable from, rather than in tension with, the
 
 Canton Railroad
 
 and
 
 Washington Stevedoring
 
 cases significantly undermines the government’s contention that
 
 Thames & Mersey
 
 must be regarded as a dead letter.
 

 The Supreme Court has also pointed to the difference in language between the Import-Export Clause and the Export Clause. Although the Court at first expressed the view that the “diversity in language” between the two clauses did not reflect any difference in
 
 *1239
 
 “the act which is prohibited,”
 
 Brown v. Maryland, 25
 
 U.S. (12 Wheat.) 419, 425, 6 L.Ed. 678 (1827), in both
 
 Michelin
 
 and
 
 Washington Stevedoring
 
 the Court has noted and attached significance to the difference between the narrow term “Imposts and Duties” (the language of the Import-Export Clause) and the broader term “Tax” (the language of the Export Clause).
 
 See Michelin,
 
 423 U.S. at 290, 96 S.Ct. at 543;
 
 Washington Stevedoring,
 
 435 U.S. at 759, 98 S.Ct. at 1404.
 

 The Court has suggested that a difference in policy underlies the difference in language. While the Import-Export Clause was intended to prohibit States from imposing a “transit fee” on goods moving in foreign commerce,
 
 Washington Stevedoring,
 
 435 U.S. at 764, 98 S.Ct. at 1406 (Powell, J., concurring in part and concurring in the result), the Export Clause served the broader purpose of “forbid[ding] federal taxation of exports.”
 
 Washington Stevedoring,
 
 435 U.S. at 758, 98 S.Ct. at 1403. The Supreme Court’s current narrower view of the prohibition in the Import-Export Clause thus does not dictate that the Export Clause be given a similarly narrow construction.
 

 Ill
 

 Urging us to anticipate the overruling of
 
 Thames & Mersey,
 
 able counsel for appellant has called our attention to the opinion of Judge Learned Hand, dissenting in
 
 Spector Motor Service, Inc. v. Walsh,
 
 139 F.2d 809, 823 (2d Cir.1943). In his opinion in that case, Judge Hand explained that a lower court should not feel obliged to follow a higher court decision “in the face of changes plainly foreshadowed,” simply because the higher court decision has not yet been explicitly overruled. While that proposition may be sound in extreme cases, we do not agree with counsel that it applies to this case. Here, unlike in the case Judge Hand put, we do not believe the change the government anticipates is “plainly foreshadowed.”
 

 Although the Supreme Court may yet reconsider the
 
 Thames & Mersey
 
 decision, and with it the Court’s traditional analysis of the Export Clause, we do not feel free in this case to take the extraordinary step of disregarding a higher court decision that all agree is binding precedent if it is still valid. Thus, the precedent that seems to us most pertinent is not Judge Hand’s dissent in the
 
 Spec-tor Motor
 
 case, but the Supreme Court’s own more recent directive to inferior courts, in
 
 Rodriguez de Quijas v. Shearson/American Express, Inc.,
 
 490 U.S. 477, 484, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1989):
 

 If a precedent of this Court has direct application in a ease, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.
 

 In light of that instruction, and the undisputed applicability of
 
 Thames & Mersey
 
 to the tax imposed in this case, we conclude that our duty is to follow
 
 Thames & Mersey
 
 and hold Section 4371 invalid as applied.
 

 AFFIRMED.